And we'll proceed to the last case on the oral argument calendar, which is Theme Promotions v. News America. This case is Theme Promotions v. News America. Good morning, Your Honors. Gary Malone representing Defendant Appellant News America. Your Honors, News America is seeking reversal of a multi-million dollar judgment on state antitrust and tort claims that were never intended to penalize the type of pro-competitive conduct we have here. What's the pro-competitive conduct that you're talking about? The pro-competitive conduct, Your Honors, is price cutting. News America was engaged in volume discounts, known as ROFRs, which stand for Right of First Refusal Agreements. News America's ROFRs covered a variety of types of agreements. It ran the gamut from saying that if a company gave News America only 20% of its FSI business, it'd get a certain discount. If it gave News America 50% of its FSI business, it'd get a bigger discount. And if it gave 100% of its business to News America, it would get an even bigger discount. Why did News America decide to enforce its Right of First Refusal Agreements? Okay, against Theme, Your Honor? The reason News America did this, Your Honor, is very simple. In 1996, Theme entered into a Right of First Refusal Agreement with News America's competitor, Velasas. Now, Velasas and News America are the only publishers of FSIs. News America, in 1997, was actually the number two play in the market. It had a little under 50% of the share of FSIs, and Velasas had a little more than 50%. So as of 1997, when News America decided to enforce its ROFR agreements against Theme, Theme had essentially an exclusive dealing arrangement with the number one player, Velasas. Theme had agreed that it would direct, or try to direct, all of its FSI business to Velasas, the number one player. And in return, Theme would get discounts and even rebates. And the record shows that from 1996 to at least 2003, Theme had either a Right of First Refusal Agreement or a Preferred Supplier Agreement, in which it agreed to direct its FSI business to the biggest player in the market, Velasas. So what did News America do? In 19- But according to you, that was pro-competitive. You're casting as though it's anti-competitive, but you opened up by saying such activity is pro-competitive. Oh, yes. We're not complaining about Velasas and Theme entering into a Right of First Refusal Agreement. It certainly is pro-competitive, Your Honor. And what News America's response was in 1997, it revised its standard ROFR agreement with PGCs to make clear that, you know, PGCs are packaged good companies, they're the companies that buy FSIs, to make clear that when a packaged good company went to Theme for a promotion and got its FSIs through Theme, that News America's ROFR agreement also applied to those FSIs. Otherwise, News America would be giving these volume discounts for getting 100% of a company's business, and it would actually be getting substantially less. If News America hadn't revised its contract, it would have been possible for a country to get a discount for giving News America 100% of its business, and yet, let's say, giving News America only 50% of its business. Are there other ways to revise your discount procedure other than what was done, though? I mean, it seems to me that it was done in order to stifle competition. I would not say it was done to stifle competition. But its purpose was to block competition, was it not? No, Your Honor, its purpose was actually to compete. Its purpose was to try to get the FSIs who had agreed to these volume discounts, to give 100% of the business to News America, to try to continue to get their business. And News America lowered its ROFR prices. The record is undisputed about this, that from 1997 to 2006, News America's FSI prices decreased substantially. And if Your Honor wants to check the record on this, you'll see that excerpt of the record 92, it shows that in 1997, News America FSI prices were at $6.62. Over the next two years, the FSI prices increased by a very slight margin, approximately 2 to 3.5%, I believe. But then for the next seven straight years, FSI prices decreased to the point that after having FSI prices of $6.62 in 1997, by 2006, News America's FSI prices had actually dropped to $5.52, a very substantial increase because of News America's competition, because it was using ROFRs to give PGCs lower prices. And I'll note that Thiem's president, Mr. Gersowitz, he agreed that what News America was doing was giving lower prices. He testified that the reason PGCs accepted News America's ROFR agreements was in order to get lower prices. And what Mr. Gersowitz, what Thiem's complaint really was, was that they were not able to take advantage of their exclusive dealing arrangement with Holacis because the PGCs wanted to take advantage of their exclusive dealing arrangement with News America. And in a recent case, the Sixth Circuit dealt with a similar situation that was decided just this past October. And that's the case of Nick Sand, Your Honor. The site is 507F3-442. It was decided in October, so it doesn't appear in any of the briefs. In the Nick Sand case, the Sixth Circuit dealt with a similar situation in which one competitor that had exclusive dealing arrangements with its customers sued another competitor that also had exclusive dealing arrangements. And what the Sixth Circuit said, when one competitor has an exclusive dealing arrangement and complains about the other competitor's exclusive dealing arrangements, you're not talking about antitrust injury, you're talking about competition. And I'll quote from page 456 of that decision. The Sixth Circuit said, when one exclusive dealer is replaced by another exclusive dealer, the victim of the competition does not state an antitrust injury. And in support of this, they cited the leading antitrust treatise, Areda and Hovenkamp on antitrust law, paragraph 1823B. And Areda and Hovenkamp say essentially the same thing. They say, clearly not a victim of antitrust injury is the exclusive dealing partner whose business relationship was terminated in favor of a different exclusive dealing partner. And that's essentially what we have here. Except Thiem acts as a buyer and a seller. It's a slightly different position, isn't it? It is certainly a slightly different position, Your Honor. But we think that for purposes of this analysis, it's substantially the same. Because what Thiem did was it partnered with the number one player in the market, Volasis, and said, we're going to try to direct all our business to you in order to get discounts and to get rebates. But in that sense, how are they any different from your primary consumers or the primary buyers, if you will, the Van Camps and so forth? In that sense, they're in the same position, aren't they? They're not, Your Honor, because what Thiem is is essentially a middleman. And obviously, Thiem as the middleman wants to make sure that it gets the lion's share of discounts, not that the ultimate consumer, the PGC, gets the ultimate discounts. And what Thiem was doing was trying to get these PGCs not to give 100 percent of their business to News America. I understand that. But in terms of antitrust injury, just given the fact that Thiem is a middle entity, a middleman, it shouldn't really make any difference, should it? Well, it does make a difference in this sense, Your Honor. The party the antitrust lawyers are seeking to protect here are the consumer. The question is, is the ultimate consumer paying lower prices? And here, that was the result with News America's ROFA agreements with the PGCs. And in terms of antitrust analysis, the fact that Thiem wants to take advantage of one exclusive dealing arrangement and prevent the PGCs from taking advantage of another, that's simply not antitrust injury. What it is, Your Honor, is Thiem essentially trying to protect its own profits. Now, this Court has recognized in numerous cases that we've cited in our briefs, such as the DataGate case and Austin v. McNamara, that when a competitor complains that it has lost sales and it doesn't show any other injury to competition, well, that's not antitrust injury. In fact, it's not injury to competition at all when a plaintiff competitor complains only about its lost sales. And that's the only injury that Thiem has shown here, Your Honor. Thiem, in order to recover on his Cartwright claim … And there's an interesting statement in there. He is trying desperately to get us to state that he is a customer. Once he wins that premise, then our ROIR clients, e.g., Chef, wouldn't be required to run with NAM or V, Velasas, I guess, and he could auction these orders off for the lowest rates. And then our agreements state that their ROIR clients must come to us even if they're handled by an agent, broker, or third party. So doesn't it appear that they're trying to avoid auctioning these off, in other words, competition for the lowest rates? Well, Your Honor, I believe what they're saying there is they don't want to have competition for the lower rates when they've already entered into a ROFR agreement with that specific PGC. But by enforcing these right of first refusal agreements, they're preventing competition in the marketplace on pricing. Well, they're not preventing competition, Your Honor. They're asking the PGCs to honor the competitive process that both sides have already agreed to. Yeah, but it seems from this that the point of this whole thing is to stop competition in pricing. I don't believe it's to stop competition in pricing. I believe it's asking … He could auction these orders out for the lowest rates. But I think there, Your Honor … We're not going to let them auction these off for the lowest rates by enforcing our agreements. But, Your Honor, I think that's a fair position for a competitor to take, when the competitor's already given the PGC discounts on the promise of getting 100 percent of the business. At the point that News America is facing this situation, it's already been giving discounts, volume discounts to the PGC on the promise to get 100 percent. Yeah, that's true, but it's like, you know, you're looking at a combination of contract and agreement, something that stifles competition, and it seems that that was the purpose of enforcing these ROFRs, was to stop competition on pricing. And that's one of the key elements that our system is supposed to promote, is competition on pricing, not stifle it. And so this agreement stopped it. Well, no, Your Honor, what this agreement does, it's asking the PGC, or seeking to hold the PGC to the competitive bargain that the parties have already reached. Once News America says, let's say, in 1997, we're going to cut your rates by 25 percent because you've promised to give us 100 percent of your business, if two years down the road, the PGC then enters into a contract with Thiem and tries to then not sell any more, not buy any more of News America's FSIs, News America's lost the benefit of its bargain. And we believe that the competitive process is best served by having the parties be able to know that if I promise to give this person a discount for 100 percent of his business, I'm going to get 100 percent of the business. Because then News America is able to give bigger discounts, if it has that guarantee. If whatever News America gives a guarantee of... Yeah, but your discounts may have pricing levels built into them that are a lot higher than the competition's offered pricing levels. You're saying, well, but you can't go there, because we've got this contract that locks you in. But then the PGC can just not renew the ROFR if the PGC actually believes that, okay, I'm being locked in here at unfavorable rates. That's not what was happening. There were no PGCs that were complaining. No, but they could have. I mean, that's the whole thing. I mean, it seems to me that there's some force to the argument that if you were operating under a pure discount situation, that would be one thing. But you're operating under a discount situation plus a requirement of exclusive dealing. Well, but companies often have exclusive dealing arrangements in order to get to essentially have a requirements contract to get 100 percent of the business, because then a company can give the biggest volume discount. Whenever News America enters into a 100 percent ROFR agreement, if it knows that, well, this agreement might say 100 percent, but it doesn't really mean that. And if the company wants to, it'll eventually buy some FSIs from Theme. News America's not going to give as big a discount. Discounts are usually just marketing devices. Everybody marks their prices way up and then claims it's a discount. We all know that's a scam. I don't believe – Professor Arita told me that was a scam. Well, I would never disagree with Professor Arita, but on this instance, I think I will, Your Honor, because if you look at the record here, News America's prices decreased substantially over a nine-year period. And that's largely because of the ROFR agreements. Theme's own president said the reason that he entered into ROFR agreements, the reason PGCs entered into ROFR agreements, was to get lower prices. Unless Your Honors have any other questions, I see I'm up to – we have five minutes remaining. I'll reserve the rest for rebuttal. Okay. Very good. We'll hear from Theme. May it please the Court, Ted Harreld from Townsend & Townsend & Crew, representing plaintiff and appellee Theme Co-op Promotions. This was a long, hard-fought case. Originally brought the case ten years ago. It's been well vetted. It's a task going to trial on this thing. But ultimately, we were able to prove that which we alleged. And what we alleged was that there was unlawful restraint and anti-competitive conduct in the market for the sale of FSIs to package goods companies. Essentially, you have two dominant market players here. You've got News America that the trial record indicates had between 60 or 65 percent during the relevant time period of the market. And, of course, that number was increasing. You used the term of the market. I was a little surprised you didn't put on an expert to define the market. Can you explain? I mean, that seems to me a very real issue in this case, is do we have an adequate definition of the market? So do you want to address that issue? Well, to be perfectly honest with you, the reason we didn't bring an expert You're always perfectly honest without the need to say that. Because if you don't say that, we don't trust that you're being perfectly honest with us. That's a good point. We didn't have the money was the reason. Plus, we also had Mr. Gersowitz, who's here in the courtroom today, who's been in the industry for 30 years. We also had John Lang, who was essentially the father of the Roe for Agreement, who also testified on behalf of Thiem. I mean, these are two market players that have been in the market far longer than, for example, Dr. Styro, who was in junior high when Mr. Gersowitz began to operate in this particular market. So she has a Ph.D. and she's an economist, but she had no experience in this market. So we believed, ultimately, what counted here was the experience and depth and breadth of knowledge in this particular market. And there's no question that Mr. Gersowitz had that far more than even their expert had, who had no experience in this particular market, but did have a Ph.D. But it's still pretty thin to use the plaintiff's president as the primary witness on defining markets in an antitrust case. Well, we actually brought in quite a bit of qualitative evidence on FSIs, that it's the dominant share of the market. Over 80 percent of all discount coupons are FSIs. We had the various industry reports that were put into evidence. We actually had testimony from News America witnesses that I cross-examined at trial about the importance and the uniqueness of FSIs. In other words, there was a real plethora of evidence, notwithstanding the fact that we didn't have an expert. In fact, Judge Walker said, and this is at excerpts of Record 333, he said there was an abundance of qualitative evidence regarding the superiority of FSIs to alternative promotional vehicles for the kinds of coupons that FSIs delivered. In other words, he was skeptical about the fact that we didn't have an expert, but ultimately, at the end of the day, when the evidence was in, he was satisfied that we proved the relevant market. Thank you. One thing that Mr. Malone said that I would like to take issue with is that he says that news lowered prices throughout the time period, but the record also shows that in 1994, when this became a two-player market between News America and Velasas, that prices were around $4, and that's when rofers were not as prevalent. As rofers became more and more prevalent, and then, of course, became central to News America's entire strategy of how to capture this market, prices went up to about $7, then hovered during the trial record around $6. They did dip slightly, but the issue is not whether prices... Let me ask you, at what point in the chronology did the newspapers start cutting substantial discounts? In other words, there was a time when newspapers were charging a lot more for the inserts, and then the industry came and said, look, we're going to use some alternate mechanisms, direct mail or something like that, and then newspapers generally had to cut substantially the amount they charged. Do you know when that happened? I believe that was around 2003. 2003, okay. But the point I was wanting to make is the issue is not whether or not News America cut prices at any point. The issue is whether or not prices would be lower if there weren't these ROFA agreements at all. And the evidence on that, there was an abundance of evidence on that. Mr. Gersowitz testified to that. Mr. Lange testified to that. And so the issue there is that these ROFA agreements, in this particular case, under the facts and circumstances of this particular market, including what's called the theme co-op paragraph, which was added to the agreement in 1997 at the time that News America stepped up its enforcement policy, it's whether or not those contractual provisions as applied to this market have an anti-competitive effect. And I think we've shown that through both circumstantial evidence and through direct evidence. The evidence is that the prices would be lower if these ROFAs were not in place and used the way that they were used by News America. John Lange, who was the father of these agreements, testified unequivocally that prices would be lower. Mr. Gersowitz testified that when he wasn't encumbered by these ROFA agreements, and remember, he's a buyer and a seller of FSIs, that when he was able to auction them off between the two FSI suppliers, he could get better prices. The reason that he went to Volasis, ultimately, is that he didn't have a ROFA agreement with them, and he didn't have a ROFA agreement with News America, and he was always able to get lower prices from Volasis. And that's in the record, and that's something the jury was allowed to look at, understand, and then reach its conclusions based on that ample evidence in the record.  Causation. Damages, of course, are a little different than liability. There's a lessened burden of proof on the damages. All we had to show, and this was Judge Walker's jury instruction, which has not been contested by News America, is that it was a substantial factor. And it's not the only factor, just a substantial factor. If there were some other factors, it was incumbent on News America to bring those. The testimony and the evidence before this jury was from Mr. Gersowitz, stating that all of this, the ROFA agreements themselves, let me start with that first, the ROFA agreements themselves were designed to preclude competition. There's no question in the record that the packaged goods companies understood that they were under an agreement that required them to place all of their business to News America, and if they tried to deviate from that, either directly themselves or through a third-party compiler, that there would be swift retribution for them. So the antitrust claim, the damages, the $1 million, is premised on the ROFA agreement itself. There's no dispute that there was an agreement. There's no dispute that News America sought to enforce that agreement. And the evidence that there was causation and it worked is what? Gersowitz's testimony? Absolutely. Tension rates? Absolutely. There was an expert, Mr. Regan, who did a before-and-after analysis who looked at theme co-ops revenues and profits before the impacted period, and they were going up and up and up. Suddenly, in 1997, when News America stepped up its enforcement policy of these ROFA agreements, you see declining revenue. So your expert's name was O-R-I-T-A? O-R-I-T-A. What was your expert's name? Regan. Regan. Okay. Yes. Mr. Regan. And he actually did two different analyses. He did a customer-by-customer analysis. So there were seven packaged goods companies at issue at trial. These were seven packaged goods companies that used to do a lot of business with theme co-op. Then after the imposition of the ROFA agreement, the stepped-up enforcement of the ROFA agreement, they declined to do further business with theme co-op. That's the micro-approach, if you will, customer-by-customer. And he opined that, based on that empirical evidence, that he saw that there was some impact going on there. Now, he can't testify to the ultimate conclusion, but empirical data of that nature is used all the time. We cited the Zenith Radio case. We've also cited the Suburban Homes case, which is a California case, on that very proposition, that you can show damage and causation based on this kind of empirical evidence and empirical data. You see business going up. You see impact. You see business going down. And there's no other explanation for it except for the stepped-up ROFA. But wasn't there a parade of witnesses from the PGCs that said this was all due to performance, not anything else? That's true. But the jury... Doesn't that impeach the expert if they come in and say, that has nothing to do with it? It was bad performance that each one of these packaged goods companies was then under contract with News America. And for them to testify in front of News America's attorneys at deposition or at trial was a very difficult thing to do. A lot of this testimony came in via deposition in the confines of a conference room where they weren't about to testify against News America.  that the ROFA agreements themselves constituted the unlawful restraint of trade that caused the damage to Thiem Co-op. There's no dispute about that. The packaged goods companies testified that they were under a ROFA agreement, that they were under threat of breach of contract from News America if they tried to place it through Thiem, and Thiem placed it with News America's competitor, Volasis. So the ROFAs themselves constitute the causation for the antitrust damages. On the tort damages, there were separate independent acts of wrongful conduct. There were threats of litigation, which is associated behavior along with it. It's not the ROFA agreements themselves. It's the associated behavior that goes along with it. And on each one of the torts, there were threats of litigation. So for Benevia, there were threats of direct litigation against them, against VDK. There were also threats of litigation with respect to... VDK being Van de Kamp? Yes. And with respect to Campbell's, which was a negligent interference case, there was an intentional misrepresentation was the independent wrongful conduct. And the evidence of that... What's wrong with threatening to enforce an agreement? Well... The question... It's clear that there was the agreement in place. The agreement provided certain exclusive rights, and your company was trying to find some way to get around the restriction of that agreement. But it's a fair question about whether or not their agreement bound them to the conduct or not, leaving aside antitrust restrictions. So what's wrong with that? Well, I would say two things. One is that this jury found that those agreements were unlawful. And second of all, the evidence was pretty clear that these threats of litigation were hollow. I mean, as they said, we were nowhere near suing... Let's take your first point, though, we weren't claiming any antitrust injury because of the agreements. So let's leave that aside. I mean, for the... Actually, my point was that just generally out there are exclusive dealing contracts per se unlawful? No. They're analyzed under the rule of reason, under the facts and circumstances of this case, which they were. And these agreements were trumped up with the theme co-op paragraph aimed directly at my client. So we say that exclusive dealing contracts, not generally, but under the facts and circumstances of this case, were unlawful, and that's what the jury so held. Well, does your argument depend in terms of the state tort actions? Does your argument of the state tort actions depend on the finding that the contracts were illegal? No. I mean, what we have is separate conduct under the state tort, which is... Assume for the sake of argument you have a legal contract. What's wrong with threatening to litigate that contract for breach? Well... The tort. Well, again, if it's done with no real purpose involved, and again, the evidence was that they had no intention of suing, that their intention was to disrupt the relationships with theme co-op. And in that case, yes, threatening litigation with absolutely no intent to carry through on that can be tortious interference. And that's what the jury was instructed, and that's what we proved. One other point I'd like to raise, unless your honors have any other questions, is on the restitution claim. This was a... We had proven our unfair competition claim. The jury rendered a verdict on that. The court adopted that verdict. That was a question of law. And Judge Walker held that the restitution was not the type that is normally awarded. But we had cited a plethora of evidence or cases in our briefs, the Fletcher case, the Korea supply case, that says what the focus is on restitution is the profits of the wrongdoer. And what Judge Walker held was, well, theme co-op would have had to buy these FSIs from some player or another. What we're seeking as restitution is where theme co-op was forced to buy the FSI from News America based on News America's profit margin. It earned a profit on those FSIs. And I think there were probably six or seven programs. The profit margin was about a million dollars, $926,000. That was profit derived by News America on its unlawful, anti-competitive behavior. That's what we were seeking in restitution. And the Fletcher case, the Korea supply case, and other cases are very clear that there's a deterrent effect to 17-200. It's not whether or not the victim would have had to buy the product or not. The focus is on whether or not the alleged wrongdoer, in this case News America, earned a profit as a result of its unlawful behavior. And that's precisely what we established at trial. So we believe that the restitution should be reinstituted as well. Any further questions? I think we have your argument in hand, but you have five minutes left if you want to talk. Thank you very much. Your Honor, first to correct a point, News America's share was not 60 to 65 percent during the relevant time period. Thiem alleged that News America engaged in wrongful conduct from 1997 to 1999, and as a result, Thiem had damages from 1998 to 2000. The relevant time period is from 1997 to 2000. News America's share, as shown by excerpt of Record 93, was from 46 to 49 percent during the relevant time period. It wasn't until after the time period when News America was able to increase its market share because it cut prices so substantially. Next. Mr. Harold said that there was sufficient evidence of a product market by showing that FSIs were unique. We believe that the Ninth Circuit cases, such as Thurman, and Kaplan, say that you really need economic evidence. Simply saying that a product is unique isn't sufficient to show a product market. In Kaplan, this Court said that the most fundamental principle of establishing a product market is cross-elasticity of demand. Here, there was no study of cross-elasticity of demand. There was absolutely no evidence of what happened to prices of other coupons during the relevant time period. There was no cross-comparison that was done. We think the cases cited in our brief, such as Kaplan and the Seventh Circuit case of Roland, say that when you don't have any comparison of prices, you can't define a product market. Next, with respect to causation. Thieme admits the only evidence on causation it had was the testimony of Mr. Gersovich and Mr. Reagan's analysis. First, I want to take the easy one, the very easy one, Mr. Reagan's testimony. Mr. Reagan testified repeatedly he did not analyze causation whatsoever, that he simply assumed causation. He simply assumed Thieme's damages from not getting repeat business from these seven companies because of what Mr. Gersovich told him. And Mr. Reagan testified to this at excerpts of records 937 to 38 and 1221. So Thieme is correct. A plaintiff can do a damage analysis to show causation, but this expert did not do it. He specifically said he didn't do any analysis of causation. Explain to me the short rate damages clause. Your Honor, the short rate damages clause says that if you promise, if a PGC promises to give 100 percent of its business to News America and then doesn't, News America then can charge the PGC its full prices that it would have charged if the PGC had never entered into the 100 percent Roe v. Agreement. Did that provide for a retroactive penalty of some kind? It did. And tell me how the retroactive penalty would have worked. We don't really know how it worked, Your Honor, because the record shows that it was never used, no company was ever threatened with it. Where was it? Was it in the agreement? It was in the agreement, yes. If a PGC promises 100 percent of its business to News America and then does not, News America can recover. Forfeit discounts you've already gotten? I believe so, essentially. That's, you know, in the street language, that sounds pretty nasty, doesn't it? Not really, Your Honor. If I say to you, I'll give you a special break if you buy 100 widgets. And if you don't, all the breaks I've given to you in the past are gone and you owe us extra money? No, not all the ones in the past, only going forward from the time we signed this agreement. And that just means then the PGC was not entitled to the discounts it got when it promised 100 percent of its business to News America. So what does retroactive penalty actually mean? I want to make sure I understand this. I'm not sure exactly how it would have worked, Your Honor. How can a retroactive penalty be imposed for actions going forward? Well, I'm not sure if it would have applied to future purchases, if the future purchase would have taken into account. Sure. I mean, you're kind of, we're getting into dodgeball now. It's your game. What was this all about? Well, what it was about, Your Honor, was saying that if a PGC promised to give 100 percent of its business to News America and then got discounts because of that, if it didn't give 100 percent of its business to News America, that means it wasn't entitled to the discounts. Right. So what was the penalty? Did they forfeit all of their discounts in the past? You say no. I'm mystified. No, I'm not sure how exactly it would work because the penalty was never actually imposed. How do we find out how it read? Read it to me. Do you have it with you there? Where is it? I have it. SDR 109, I believe, by Judge Thomas. You had cited it to that before. Maybe it was you, Judge Straut, on where fee was free to auction off to get lower prices. Yeah, yeah. It's his time. It's his time. But, Your Honor, with respect to the, I'm sorry, you. Well, no, I mean, your answer is it was never enforced so we don't know and that it's, the penalty is determined in the four corners of the contract. So what was the penalty? They lost past discounts? Yes. They lost all of their past discounts? I believe so, Your Honor. And the typical contract period was how long? It varied. It varied, I believe, from six months to three years. Okay. So if enforced, if I understand it correctly, then they would have to pay full price for the sites of three-year contract  That would be the retroactive penalty under the clause? To be honest, Your Honor, I don't have the contract in front of me. I'm not sure. I believe that's accurate, but I'm not positive. Okay. And, Your Honor, just a few other points. With respect to the, that provision, there was no testimony that it ever played a role in any PGC's decision. There's no testimony that it had any effect. And with respect to whether or not the rofers caused any damage to Thiem, Mr. Gersowitz testified that NewsAmerica's rofers never actually prevented him from running any program whatsoever. Because what the rofers were designed to do was to get Thiem to buy its rofers from NewsAmerica, not to stop Thiem from doing business. And Mr. Gersowitz testified, and a Velasquez representative testified, that when NewsAmerica had a rofer agreement with the PGC, Thiem was able to run its program even though the PGC had a rofer with NewsAmerica, Thiem was able to run the program by buying NewsAmerica rofers. So Thiem's own evidence was that NewsAmerica did not prevent it from running any program. What Thiem's damage theory was was that certain PGCs stopped doing business with Thiem because they were displeased with having to deal with the issues raised by the rofer agreements. But this was just a theory. No PGC said this. Mr. Gersowitz could not point to anything that PGC said or did that indicated it stopped doing business with Thiem because of this reason. So all we have essentially is Mr. Gersowitz's conclusory testimony. And this Court, in cases such as the Hunt case and the Philco case that we cite in our briefs, has said repeatedly you need more than just the conclusory testimony of a plaintiff regarding causation. Otherwise, any time you have a plaintiff such as Thiem that has an abysmal, abysmal performance with PGCs can simply come to court and say I can't figure out why my profits went down. It must be something my competitor did. I want to sue for antitrust and tort claims. You're over your time. Do you have any questions? This is the language I guess that we're talking about. And if the ad runs at V, I'm talking about SCR 109, and if the ad runs at V, that's the lasis, correct? Right. Then, of course, you, Sheff, have breached your NAMROFR agreement and will be subject to short-rate damages. Hopefully, Sheff, you are indemnified by TCP because they are the ones that made you breach our agreement. Otherwise, you will have a big expense to pay. And then I would let, I would let all this to Sheff so they will tell TCP to sign the LOC parentheses and hopefully be so bad at theme they will never run another FSI through them. You want to translate any of that for me? Well, what News America is indeed saying there is that if theme, I'm sorry, if a company breaches its agreement with News America, it can be subject to damages for the discounts that News America gave on the promise it would get 100% of its business. And be so bad at theme they will never run another FSI through them. I guess that means what it says. Well, yes, Your Honor. But I think what this is actually showing is that News America was indeed competing aggressively. Aggressively is right. But the antitrust laws want to protect aggressive competition that leads to lower prices for consumers, which they just did. And the record also shows that despite that language in one letter, News America and theme continue to do business throughout this period. In fact, theme's case at trial was that News America was forcing it to buy News America FSIs. You well know we're not retrying the case. We're simply looking for substantial evidence that supports verdicts. Certainly, Your Honor. But there is no substantial evidence here of antitrust injury. I'll just also point out that theme needed to show not just that it suffered antitrust injury, but also it needed to show that there was injury to competition. Here there was no showing of injury to competition. There's no showing that News America's revision of its ROFR agreements caused prices to increase or for output to decrease. In fact, Mr. Reagan, theme's own expert, said output increased throughout the relevant time period. And he said because of that he didn't believe that theme's damages were even related to market conditions. Thank you, Counsel. Okay. Thank you, Your Honor. Although you're entitled to serve rebuttal, it's limited to your cross appeal. Cross appeal. Okay. So that means you've got the prospective economic advantages, the restitution argument, and the injunction. Okay. Can I just point out the actual language of the short rate penalty clause is found at ER 1319. All right. With respect to our cross appeal, we have asserted that the damages that were awarded by the jury on our intentional interference claims, this is for Benevia and for VDK, and upon which punitive damages of $2.5 million were assessed, were supported by the evidence. And Judge Walker, again, held that there was an abundance of evidence of these litigation threats against these two companies. There was evidence that this caused them to do business with Thiem, and that we should have been entitled to the damages awarded by this jury based on that record. The issue was whether or not these litigation threats were privileged under Knorr-Pennington. And the trial court held that the Sosa case had just come down right before the oral argument on the Jaymall motion. And in Sosa, the court had held, under the facts of that case, that was a Federal RICO case. It was not a diversity case, that the Federal law of preemption would apply to that case. And Judge Walker applied that, the Sosa case, under the facts and circumstances of our case, which, of course, is a diversity action under state law. But if Knorr-Pennington is based on the First Amendment, which its roots are, why does that make any difference? Why wouldn't a Federal privilege apply if there are constitutional ramifications to it? Well, I mean, even the Sosa court, for example, and I could give you the exact page, even the Sosa court talked about the California Privilege Law, talked about 47B in its ruling, pre-litigation. So it seemed to accept the fact that California Privilege Law, Civil Code Section 47B, was still alive and well. In fact, pointed to the California Privilege Law as protecting some pre-litigation conduct and said, see, other courts are doing that as well, clearly recognizing that California Privilege Law is still alive and well. Essentially what NewsAmerica... Maybe it may be well in addition to Knorr-Pennington, but it may not be. I mean, if the idea is that Knorr-Pennington, because it's a Federal doctrine rooted in the First Amendment, trumps any state law to the contrary, why does it make any difference that it's a diversity case? Why does it make any difference that it would preempt California law on this, notwithstanding the choice of law principles that California Privilege Law would normally apply? Yeah, that was my question. And I think under a preemption argument that that simply would not fly. Federal... Let's take the Falwell case, for example, a different context. That was an intentional infliction case, and the United States Supreme Court applied those principles in a state tort action. That was a diversity case. Well, I guess the question would be whether or not 47B would provide adequate protection for both purposes. That's not the question at all. It may provide adequate protection, but the question... You say that Knorr-Pennington can't apply at all in a state diversity case, and it seems to me that it probably does. Well, I think that's a close question. I would concede that. We believe that SOSA is distinguishable. The SOSA court was very careful in talking about the RICO case there. This was a federal statute. And in this case, we're not talking about any federal interests at all, except for the constitutional interests, but we're talking about tortious interference at this point. But I think even more important is the fact that the Clipper Express case finds an exception. Even if Knorr-Pennington were to apply, and we maintain that it doesn't, but even if it were to apply, if this preconduct, or this pre-litigation conduct is in furtherance of the antitrust conspiracy itself, then it's not privileged conduct. And that's the Clipper Express case. So I think that's dispositive of this issue as well. As a result, then, we believe that the jury's verdict on the two intentional interference claims should stand, and that the compensatory and punitive damages should be awarded. I've already mentioned the restitution argument probably out of turn, and I apologize for that. No, no, your title to rebuttal, so that was fine if you argued it that way. Okay. I'd just like to point out on the injunctive relief, which was what Judge Walker held was that he wasn't able to carve out an appropriate injunction in this case. And I believe what the district court thought was that we were saying that ROFRs should be excluded or should be prevented from being enforced overall. But there was an alternative relief that we sought, which is these ROFR agreements shouldn't be applied to Thiem. Thiem didn't sign these contracts. And that's clear. It's a third party to these contracts. Yet what News America did was wrote the Thiem co-op paragraph, which applied to third parties who bought the FSIs on behalf of packaged goods companies, essentially trying to reach outside the contract to third parties to that contract. And what we argued was that's an appropriate injunctive remedy there. These ROFR agreements, if you want to continue to apply them or allow them with respect to the packaged goods companies who signed them, and we maintain they were forced into signing them, they shouldn't be enforced against Thiem. And that was the limited relief that we sought. And we submit that the trial court could have granted us that relief. Thank you very much. Thank you, counsel. The case just heard will be submitted. I take it that you are to the point in this case where the, if we were to refer it to the circuit mediator, you do not believe that that would be successful? We're always open to mediation. We're open to mediation. All right. It won't make any difference in our decision, but I know you've been at this a long time. You're continuing to do business. And sometimes in these kind of circumstances, the assistance of the mediator is helpful in resolving a business relationship. So we'll take that. Thank you.
judges: Trott, Thomas, Paez